# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 15-1823-cv

DONAHUE FRANCIS,
*Plaintiff-Appellant*,

v.

KINGS PARK MANOR, INC., AND CORRINE DOWNING,
*Defendants-Appellees*,

and

RAYMOND ENDRES,
*Defendant*.

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED *EN BANC*: SEPTEMBER 24, 2020
DECIDED: MARCH 25, 2021

Before: LIVINGSTON, *Chief Judge*, CABRANES, POOLER, KATZMANN, CHIN, LOHIER, CARNEY, SULLIVAN, BIANCO, PARK, NARDINI, MENASHI, *Circuit Judges*.[*]

———————

CABRANES, *Circuit Judge*, filed the majority opinion, in which LIVINGSTON, *Chief Judge*, SULLIVAN, BIANCO, PARK, NARDINI, and MENASHI, *Circuit Judges*, joined in full.

CHIN, *Circuit Judge*, joined by POOLER, KATZMANN, LOHIER, and CARNEY, *Circuit Judges*, filed an opinion dissenting in part and concurring in part.

LOHIER, *Circuit Judge*, joined by POOLER, KATZMANN, CHIN, and CARNEY, *Circuit Judges*, filed an opinion dissenting in part and concurring in part.

———————

[*] Judge Katzmann, who assumed senior status on January 21, 20201, participated in this case pursuant to 28 U.S.C. § 46(c).

2

The principal question presented to the *en banc* Court is whether a plaintiff states a claim under the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. § 3601 *et seq.*, and parallel state statutes for intentional discrimination by alleging that his landlord failed to respond to reported race-based harassment by a fellow tenant. We conclude that landlords cannot be presumed to have the degree of control over tenants that would be necessary to impose liability under the FHA for tenant-on-tenant misconduct.

We **VACATE** the panel decision and **AFFIRM** the judgment of the District Court dismissing the Complaint.

———

SASHA SAMBERG-CHAMPION (John P. Relman, Yiyang Wu, *on the brief*), Washington, D.C., *for Plaintiff-Appellant*.

3

FRANK W. BRENNAN (Stanley J. Somer, Paul A. Bartels, *on the brief*), Uniondale, NY, *for Defendants-Appellees.*

DEBO P. ADEGBILE (Stephanie Simon, *on the brief*), New York, NY, *Amicus Curiae in support of Plaintiff-Appellant.*

ALEXANDER V. MAUGERI, Deputy Assistant Attorney General (Eric S. Dreiband, Assistant Attorney General, Thomas E. Chandler, Attorney, U.S. Department of Justice; J. Paul Compton, Jr., General Counsel, Timothy J. Petty, Deputy General Counsel, U.S. Department of Housing and Urban Development, *on the brief*), Washington, D.C., *for* the United States of America, *Amicus Curiae in support of neither party.*[†]

---

[†] *See* Appendix A for a list of filings by amici curiae who did not participate in oral argument.

JOSÉ A. CABRANES, *Circuit Judge*:

The principal question presented to the *en banc* Court is the following: Does a plaintiff state a claim under the Fair Housing Act of 1968 ("FHA")[1] for intentional discrimination by alleging that his landlord failed to respond to reports of race-based harassment by a fellow tenant? On the record before us, we answer this question in the negative. As persuasively explained by our dissenting colleague on the panel, we think landlords typically do not, and therefore cannot be presumed to, exercise the degree of control over tenants that would be necessary to impose liability under the FHA for tenant-on-tenant harassment.[2]

It is undisputed that the FHA, a landmark civil rights statute, makes it unlawful for a public or private landlord intentionally "[t]o

---

[1] 42 U.S.C. § 3601 *et seq.*

[2] *See Francis v. Kings Park Manor, Inc.*, 944 F.3d 370, 381-95 ("*Francis I*") (Livingston, J., dissenting).

discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race, color, religion, sex, familial status, or national origin."[3] There is thus no question that a landlord may be liable under the FHA for intentionally discriminating against a tenant based on race. But after more than five decades of experience in applying this important statute, our Court adopted a rule that would make landlords responsible under the FHA not only for their own affirmative discriminatory acts, but also for failing to respond to tenant-on-tenant discriminatory harassment. Although framed in terms of intentional discrimination, the panel majority's decision effectively established a landlord's positive duty under the FHA to police the conduct of tenants in their relations with each other.

We ordered rehearing of this appeal *en banc*, which took place in September 2020. It was the most recent chapter in a case that began

---

[3] 42 U.S.C. § 3604(b).

in 2014, when Plaintiff-Appellant Donahue Francis filed a complaint (the "Complaint") in the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) against his landlord, Kings Park Manor, Inc. ("KPM"); Corinne Downing, KPM's property manager (with KPM, the "KPM Defendants"); and a fellow tenant, Raymond Endres.[4]

## I. BACKGROUND

In ruling on a motion to dismiss, we "must take all of the factual allegations in the complaint as true."[5] According to the Complaint, at all relevant times, Francis, a Black man, rented and lived in an apartment at Kings Park Manor, a residential complex in Suffolk

---

[4] In the intervening six years, this hard-fought litigation has yielded opinions by the District Court, *Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420 (E.D.N.Y. 2015), as well as successive panel majority and dissenting opinions on appeal, *Francis v. Kings Park Manor, Inc.*, 917 F.3d 109 (2d Cir.), *opinion withdrawn*, 920 F.3d 168 (2d Cir. 2019), and *Francis I*, 944 F.3d at 370. To avoid undue repetition, we respectfully refer our readers to these thorough opinions and summarize here only the most salient aspects of the record.

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

County, New York, owned and operated by KPM. **[A.18]** On approximately eight occasions between February and September of 2012, Endres, Francis's neighbor and fellow tenant, verbally attacked and otherwise attempted to intimidate Francis, including by racist insults and at least one death threat. On March 11, 2012, Francis reported Endres to the Suffolk County police, who in turn informed KPM of the reported events. Francis himself did not mention Endres to the KPM Defendants at this time, however, and several months later, on May 1, 2012, Francis renewed his lease without comment. In total, Francis wrote three certified letters to KPM, in which he recounted Endres's behavior, the police's involvement, and Endres's arrest for aggravated harassment in August 2012. Francis does not allege, nor do any of the exhibits to his Complaint show, that he ever requested any action by KPM. Francis alleges that KPM did not at any point investigate or intervene; in fact, Francis claims that KPM's owners expressly directed Downing, their property manager, "not to

8

get involved."[6] When Endres's lease expired in January 2013, five months after he was arrested, Endres vacated his apartment. He pleaded guilty to a charge of harassment in April 2013.

Francis's Complaint asserted claims of racial discrimination against all defendants under the FHA, Section 1 of the Civil Rights Act of 1866, as amended and codified at 42 U.S.C. §§ 1981[7] and 1982,[8] and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, as well as a common-law claim of negligent infliction of emotional distress. The Complaint also included a breach-of-contract

---

[6] A.24 (Complaint ¶ 47).

[7] Section 1981 provides, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

[8] Section 1982 provides, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

claim against the KPM Defendants and a claim against Endres for intentional infliction of emotional distress.

In August 2014, the KPM Defendants moved to dismiss all of Francis's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). In March 2015, the District Court denied the motion as to Francis's breach-of-contract claim but otherwise granted it, dismissing Francis's other claims against the KPM Defendants.[9] Judgment entered on May 5, 2015, and Francis timely appealed.

A divided panel of this Court issued an opinion on April 5, 2019, with Judge Livingston dissenting.[10] The panel majority affirmed the dismissal of Francis's claims for negligent infliction of emotional distress but reversed the dismissal of his discrimination claims. On December 6, 2019, the panel majority and dissenter filed revised

---

[9] Francis voluntarily withdrew his breach-of-contract claim and consented to entry of partial final judgment pursuant to Federal Rule of Civil Procedure 54(b) with respect to the other claims he asserted. *See* A.122-24.

[10] *See Francis*, 917 F.3d at 109.

opinions.[11] Rehearing *en banc* was ordered and oral argument took place in September 2020.

## II. DISCUSSION

"[W]e review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6)."[12] In assessing the complaint, we "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor."[13] Nonetheless, conclusory allegations are not entitled to the assumption of truth, and a complaint will not survive a motion to dismiss unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[14]

---

[11] *See Francis I*, 944 F.3d at 373, 381.

[12] *Austin v. Town of Farmington*, 826 F.3d 622, 626 (2d Cir. 2016).

[13] *Id*. at 625.

[14] *Iqbal*, 556 U.S. at 678, 680 (internal quotation marks omitted).

11

## I. Housing Discrimination Under the FHA[15]

The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ."[16] When, as here, a plaintiff brings a claim under the FHA that does not rest on direct evidence of landlord discrimination, we analyze the claim under the familiar *McDonnell*

---

[15] Francis claimed initially on appeal that he had stated an FHA claim against the KPM Defendants for "negligent failure to remedy a discriminatory and hostile environment." Dkt. 37 at 14 (capitalization omitted). Francis asserted the existence of a negligence claim based chiefly on an asserted analogy between the FHA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), a statute governing employment discrimination. On rehearing *en banc*, Francis has abandoned his negligence theory of landlord liability and concedes that it would be reasonable for this Court to reject such a claim. *See* September 24, 2020 *En Banc* Oral Argument Transcript at 10:12-24.

[16] 42 U.S.C. § 3604(b). The FHA also forbids "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . . " 42 U.S.C. § 3617.

12

*Douglas* burden-shifting framework first developed in Title VII cases.[17]

Plaintiffs have specific, "reduced" pleading burdens in cases subject to

the *McDonnell Douglas* analysis.[18] For a plaintiff's claim to survive a

motion to dismiss in a *McDonnell Douglas* case, he must plausibly

allege that he "[1] is a member of a protected class, . . . [2] suffered an

adverse . . . action, and [3] has at least minimal support for the

proposition that the [housing provider] was motivated by

discriminatory intent."[19]

---

[17] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We have widely applied the *McDonnell Douglas* framework to the various antidiscrimination laws. *See, e.g.*, *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) (applying *McDonnell Douglas* framework to disability discrimination claim); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (age discrimination claim); *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (FHA disparate treatment claim).

[18] *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) ("[T]he complaint [in a *McDonnell Douglas* case] . . . must be viewed in light of the plaintiff's minimal burden to show discriminatory intent [at the initial stage of the *McDonnell Douglas* analysis] . . . . The facts alleged must give plausible support to the reduced [initial evidentiary] requirements that arise under *McDonnell Douglas* . . . .")

[19] *Id*. (defining pleading standards for Title VII claims alleging discrimination on the basis of sex and race).

13

We conclude that the factual allegations in Francis's Complaint do not suffice to carry his modest burden.[20] Although Francis has claimed that he is a member of a protected class, his Complaint lacks even "minimal support for the proposition" that the KPM Defendants were motivated by discriminatory intent.[21] The Complaint alleges, in a conclusory fashion, only that the "KPM Defendants have intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law."[22] But because the Complaint does not provide enough information to compare the events of which

---

[20] One of our dissenting colleagues characterizes this case as turning on the "very limited issue" of "whether the specific allegations in a complaint satisfy the plausibility pleading standard" and doubts that this is a "question of exceptional importance" warranting rehearing *en banc*. Lohier, J. Dissenting Op. at 21 n.8 (quoting Fed. R. App. P. 35(a)(2)) (hereinafter "Lohier Dissent"). This case raises questions of exceptional importance because the panel's ruling, if undisturbed, would significantly expand landlord liability, with the probable result of fundamentally restructuring the landlord-tenant relationship. See Note 44, *post*.

[21] *Id*. at 311. Because we conclude that Francis has failed to adequately allege that the KPM Defendants' failure to intervene was motivated by discriminatory intent, we need not address whether that failure constituted "adverse action" within the meaning of *McDonnell Douglas*.

[22] A.28 (Complaint ¶ 63).

Francis complains to the KPM Defendants' responses to other violations, there is no factual basis to plausibly infer that the KPM Defendants' conduct with regard to Francis was motivated by racial animus.[23]

To hold that Francis has plausibly pleaded discriminatory intent on these facts would be to indulge the speculative inference that "because the KPM Defendants did *something* with regard to *some* incident involving *some* tenant at *some* past point," racial animus explains the failure to intervene here.[24] Francis does not allege that the KPM Defendants regularly intervened in other disputes among tenants, much less that it had a practice of addressing tenant-on-tenant

---

[23] Judge Lohier takes issue with our acknowledgement that Francis's Complaint alleged *some* information, but not enough to transform his claim from conceivable to plausible. Lohier Dissent at 17-18. But this is exactly what *Twombly* and its progeny require us to do. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) ("On a motion to dismiss, the question is . . . whether plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

[24] *Francis I*, 944 F.3d at 384 (Livingston, J., dissenting).

harassment when the matter did not involve an African American victim and a white harasser. Francis's vague allegation that the "KPM Defendants have intervened against other tenants . . . regarding non-race-related violations of their leases" could refer to efforts to collect rent, stop unauthorized subletting, or remedy improper alterations to the rental premises. Only untethered speculation supports an inference of racial animus on the part of the KPM Defendants. We decline to engage in such speculation.[25]

---

[25] Court-appointed *amicus curiae* Debo Adegbile suggests that we can infer a discriminatory motive from KPM's alleged departure from policy within a "larger context of racial antagonism." Adegbile Br. at 42-43. This argument is unavailing. The Complaint alleges no details regarding the KPM Defendants' actions in comparable circumstances, nor does it otherwise support the inference that a relevant "policy" existed, much less that the KPM Defendants departed from it. In the cases Adegbile cites, the actors who created the "context of racial antagonism" could be reasonably presumed to have substantial influence over the party charged with discrimination. *See, e.g.*, *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 612 (2d Cir. 2016) (housing board discriminated by knowingly "acquiesc[ing] to race-based citizen opposition" to affordable housing). By contrast, Francis's Complaint provides no factual basis to suggest, much less show, that Endres had any influence over the KPM Defendants.

In an apparent attempt to avoid the obligation to plead facts that plausibly support an inference that the KPM Defendants were motivated by racial animus, Francis asserts that his allegations establish that the KPM Defendants intentionally discriminated against him under a deliberate indifference theory of liability. This theory of liability has been applied almost exclusively in custodial environments such as public schools and prisons, where it is clear that the defendant has both "substantial control over the context in which harassment occurs" and "a custodial [power over the harasser] . . . permitting a degree of supervision and control that could not be exercised over free adults."[26] Francis argues that a landlord may be held liable for intentional discrimination if the landlord "ignore[d] the known discriminatory harassment of a third party."[27]

---

[26] *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646 (1999) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995)).

[27] *En Banc* Opening Brief of Appellant Donahue Francis ("Appellant's *En Banc* Opening Brief"), Dkt. 217, at 38 (quotin*g Davis*, 526 U.S. at 645).

We assume, for purposes of this appeal, that deliberate indifference may be used to establish liability under the FHA when a plaintiff plausibly alleges that the defendant exercised substantial control over the context in which the harassment occurs and over the harasser.[28] Nevertheless, we hold that Francis has failed to state a claim because his Complaint provides no factual basis to infer that the KPM Defendants had "substantial control over [Endres] and the context in which the known harassment occur[red]."[29] Nor can such control be

---

[28] The dissent suggests that "the majority opinion . . . assumes a landlord may be liable for being deliberately indifferent to the general circumstances Francis alleges." [**RJL Dissent, 2:3-5**]. Not so. We assume, without deciding, that deliberate indifference may be used to ground an FHA claim when a plaintiff plausibly alleges that a defendant had the requisite control over both the alleged harasser and the context in which the harassment occurs. *See Davis*, 526 U.S. at 646. As set forth herein, no such control is present in the typical landlord-tenant relationship, nor does the Complaint suggest that the KPM Defendants had such control here.

[29] *Davis*, 526 U.S. at 645. One of our dissenting colleagues takes issue with the different courses taken by our Court in granting *en banc* rehearing here in *Francis* and denying it in *Mandala v. NTT Data, Inc.*, No. 19-2308. This analogy, made in an attempt to show "inconsistently applied . . . legal standards," is misplaced. Chin, J. Dissenting Op. at 5 (hereinafter, "Chin Dissent"). To put it plainly, *Francis* and *Mandala* are different cases. While both cases involve similar statutory schemes and were disposed of at the pleading stage, that is where the similarities end. One presents a novel FHA intentional discrimination claim, while the other is a Title VII disparate impact case—and they feature completely different legal and factual

18

reasonably presumed to exist in the typically arms-length relationship between landlord and tenant, unlike the custodial environments of schools and prisons.[30] The typical powers of a landlord over a tenant—

issues. *Mandala* addressed whether the plaintiffs in that case had adequately pleaded a claim under Title VII. Here, by contrast, the panel's opinion held, for the first time since the FHA was enacted over fifty years before, that a plaintiff may hold his landlord liable under the FHA based on the conduct of another tenant. That decision dramatically expanded the scope of the FHA and effectively established a new cause of action under federal law. Unlike the pleading issue in *Mandala*, this case "raise[s] issues of important systematic consequences for the development of the law and the administration of justice," *Watson v. Geren*, 587 F.3d 156, 160 (2d Cir. 2009) (per curiam) (en banc), and there is no inconsistency in the Court's treatment of the two cases.

[30] Francis's attempt to analogize the FHA to Title IX, 20 U.S.C. § 1681 *et seq.*, ignores the substantial textual differences between the two statutes. While Section 3604(b) of the FHA simply prohibits *committing* discrimination, Title IX also prohibits *permitting* discrimination. Instead of focusing on the intent of the actor, as the FHA does, *see* 42 U.S.C. § 3604(b) (making it unlawful to "discriminate . . . because of" a protected characteristic), the language of Title IX evinces a concern for consequences, *see* 20 U.S.C. § 1681(a) (prohibiting a student from being "excluded from participation in," "denied the benefits of," or "subjected to discrimination under any education program or activity"). Accordingly, Title IX is best read as requiring a lesser showing of intent for liability than does Section 3604(b) of the FHA. *See, e.g.*, *Davis*, 526 U.S. at 649 (holding that defendant board of education could be held liable if plaintiff could "show that the Board '*subjected*' [plaintiff] to discrimination by failing to respond" to complaints of harassment (alteration omitted and emphasis added)).

19

such as the power to evict—do not establish the substantial control necessary to state a deliberate indifference claim under the FHA.[31]

Francis's appeal to the employment context to support his theory of liability for landlords under the FHA is also unavailing. He argues that since employers are responsible for employee-on-employee harassment under Title VII, landlords must be responsible for tenant-on-tenant harassment under similarly worded provisions of the FHA.[32] But the employer-employee relationship differs from the landlord-tenant relationship in important ways. Employees are considered agents of their employer. And a landlord's control over

---

[31] Contrary to the views of the dissenters, we draw no inferences against Francis, nor do we hold his Complaint to a "probability" standard or otherwise heighten his pleading burden. *See* Lohier Dissent at 17, 18; Chin Dissent at 2, 4. Rather, we conclude as a matter of law that the ordinary powers of a landlord do not establish the substantial control over tenants necessary to impose liability on landlords under the FHA for tenant-on-tenant conduct. Here, Francis simply fails to allege—either plausibly or implausibly—that the KPM Defendants had extraordinary power over tenants. Francis therefore fails to allege a necessary element of his FHA claim.

[32] *See, e.g.*, Appellant's *En Banc* Opening Brief, Dkt. 217, at 23-25.

tenants and their premises is typically far less than an employer's

control over "free adult[]" employees and their workspaces.[33] We are

hard-pressed to presume that an employer's manner and degree of

---

[33] *Davis*, 526 U.S. at 646 (quoting *Acton*, 515 U.S. at 655). As the panel dissenter explained, "an employee is considered an agent of the employer while the tenant is not considered an agent of the landlord" and "employers . . . exert far more control over not only their employees, but also the entire workplace environment than do landlords over their tenants and the residences those tenants quite literally call their own." *Francis I*, 944 F.3d at 391-92 (Livingston, J., dissenting). The Supreme Court has observed that the workplace is generally characterized by "[p]roximity and regular contact" among employers, supervisors, and employees. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760 (1998). Most employers have ready access to, effective control over, and the ability to move within, the physical workplace and can freely dismiss at-will employees. Employers typically can, and generally do, "monitor employees" as well as use a wide range of tools to adequately "investigate . . . misconduct" (including mandatory interviews and other means of gathering information) and "remediate . . . misconduct" (including suspension, compensation reduction, demotion, transfer, training, and dismissal), all of which gives employers extensive and reliable control over employee behavior. *Francis I*, 944 F.3d at 392-93 (Livingston, J., dissenting). Accordingly, this Court has recognized employer liability for the actions of non-employees under Title VII only where "(1) the employer *exercises a high degree of control over the behavior of the non-employee*, and (2) the employer's own negligence permits or facilitates that non-employee's discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 39 (2d Cir. 2019) (emphasis added) (internal quotation marks omitted).

21

control over its agent-employees is equivalent to that of a landlord over its tenants.[34]

To hold the KPM Defendants liable for Endres's conduct on the facts alleged would also be inconsistent with the background tort principles against which the FHA was enacted. The Supreme Court has been clear that when Congress creates "a species of tort liability,"[35] as it did in enacting the FHA, Congress "legislates against a legal background of ordinary tort-related . . . liability rules" which it presumptively "intends its legislation to incorporate."[36]

Under New York law, landlords have a duty "to take reasonable precautionary measures to protect members of the public from the

---

[34] A landlord may well have *contractual* liabilities to tenants resulting from the acts of third parties, but these are typically satisfied by appropriate *contractual* remedies like rent abatement. *See, e.g.*, *Nostrand Gardens Co-Op v. Howard*, 221 A.D.2d 637, 638 (2d Dep't 1995) (affirming rent abatement based on landlord's failure to remedy excessive noise emanating from neighboring apartment).

[35] *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (quoting *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999)).

[36] *Id.*

reasonably foreseeable criminal acts of third persons . . . on the premises."[37] But New York tort law has long been clear that a landlord has no general duty to protect tenants even from "the criminal acts of yet another tenant, since it cannot be said that [a] landlord ha[s] the ability or a reasonable opportunity to control [the offending tenant]" and the "power to evict cannot be said to . . . furnish" such control.[38]

---

[37] *Luisa R. v. City of New York*, 253 A.D.2d 196, 200 (1st Dep't 1999). As the facts of *Luisa R.* suggest, however, this duty applies only where harm was allegedly caused by conditions that posed a risk to the general public (not just to specific tenants) and where both the foreseeability of criminal acts and the landlord's practical ability to respond were evident. *See id.* at 198-203 (tenant plaintiff's negligence claim survived summary judgment, where plaintiff was assaulted by intruder associated with non-tenant drug dealers, and landlord failed to maintain working doors, locks, or intercom and to remove non-tenant drug dealers).

[38] *Blatt v. N.Y.C. Hous. Auth.*, 123 A.D.2d 591, 592-93 (2d Dep't 1986). Notably, the *Blatt* court held that the landlord had no duty of care even when (1) the plaintiff alleged more severe co-tenant misconduct than is alleged here; and (2) the defendant landlord, unlike KPM here, allegedly promised the plaintiff that it would protect him and evict his harasser. *See id.* at 591 (co-tenant threatened plaintiff with a gun and "warn[ed plaintiff] to 'stay away from his daughter' or he would 'blow [his] brains out'" and—roughly six weeks after the landlord assured plaintiff of protection—co-tenant shot plaintiff in apartment building lobby after declaring his intent to kill plaintiff). While we agree with Judge Lohier that the degree of control sufficient for landlord liability for the behavior of tenants under New York law is fact-dependent, Lohier Dissent at 25, cases like *Blatt* make clear that landlords cannot be presumed to have substantial control over tenants without allegations of unusual circumstances. Francis alleges no facts suggesting that KPM's relationship

23

It is true that the Seventh Circuit, in *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856 (7th Cir. 2018), has recognized a deliberate indifference theory of liability for a claim of discrimination under the FHA.[39] But, unlike in this case, the plaintiff's allegations in *Wetzel* gave rise to the plausible inference that the defendant-landlord had unusual supervisory control over both the premises and the harassing tenants.[40] Moreover, as the panel dissenter observed, the

---

with its tenants was in any way atypical. The lease terms identified by the dissent to support an inference of substantial control (terms forbidding tenants from impairing the "rights, comforts or conveniences" of other tenants, A.61) are unremarkable, and do not suggest the existence of a special "arsenal of incentives and sanctions" reasonably attributable to KPM. *See* Lohier Dissent at 26 (quoting *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 865 (7th Cir. 2018).

[39] As the majority panel opinion acknowledged, the Seventh Circuit is the only other circuit to have entertained this theory of FHA liability in circumstances even arguably analogous to those here. *Francis I*, 944 F.3d at 378.

[40] *See Wetzel*, 901 F.3d at 860-65 (defendant landlord ran a "living community" for senior citizens with "a common living area, a common dining area, common laundry facilities, and hallways" and had a demonstrated capacity to restrict tenants' access to common spaces, suspend cleaning services, assign dining locations, and enter private apartments). Our dissenting colleagues note that the *Wetzel* court did not expressly limit its reasoning to circumstances involving enhanced landlord control and made clear that it was not determining the FHA's application to circumstances that "more closely resemble[] custodial care, such as a skilled nursing facility, or an assisted living environment, or a hospital." *Id*. at 864; *see also* Lohier Dissent at 29 n.12. It does not follow, however, that the *Wetzel* court

24

landlord in *Wetzel*, unlike the KPM Defendants, was alleged to have affirmatively acted against the plaintiff.[41] In the absence of any factual allegations suggesting that the KPM Defendants had a similarly unusual degree of control over the premises and tenants, or actively facilitated or compounded harm to Francis, the Seventh Circuit's decision in *Wetzel* does not suggest, much less compel, a different outcome here.[42]

---

counterfactually presumed that it was confronted with a *typical* landlord-tenant relationship—*i.e.*, one with virtually no resemblance to custodial care at all. Therefore, we cannot accept the proposition that *Wetzel* purports to set a "floor" for landlord liability for tenant conduct under the FHA. In any event, the Seventh Circuit's decision in *Wetzel*, while instructive, is of course not binding on this Court.

[41] *Francis I*, 944 F. 3d at 391 ("The defendant-landlord [in *Wetzel*] was alleged not only to have failed to remediate harassment of the plaintiff by other residents, but also . . . to have *itself* barred the plaintiff from common spaces that she was entitled to frequent.")

[42] Francis's lease with KPM contained provisions that arguably prohibited the actions Francis imputes to Endres. *See* A.61 Landlord-Tenant Agreement § B(4) ("Tenant shall not allow or commit any objectionable or disorderly conduct . . . that disturbs or interferes with the rights, comforts, or conveniences of other residents"); A.63 HAP Contract Addendum § 8(c)(1)(a) ("The owner may terminate the tenancy during the term of the lease if any member of the household commits . . . [a]ny criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents."). However, even if we were to assume that Endres's lease with KPM contained substantially identical terms to

25

As a final matter, we note that even if Francis had plausibly pleaded that the KPM Defendants had substantial control over Endres, he would still have failed to state an FHA claim for discrimination under a deliberate indifference theory. To state a deliberate indifference claim, a plaintiff must plausibly plead that the defendant's response to harassment by a third party was "clearly unreasonable in light of the known circumstances."[43] It cannot be said that the KPM Defendants' inaction was "clearly unreasonable" in light of the circumstances described in Francis's Complaint. The KPM Defendants were aware that the police were involved, and indeed, the police conducted an investigation that ultimately led to Endres's arrest

---

Francis's, those terms would not afford KPM sufficient control over Endres to make it liable for his actions. Endres's breach of those terms might give KPM grounds to terminate his lease, but as the *Blatt* court held, the "power to evict cannot be said to . . . furnish[]" a landlord with the "ability or a reasonable opportunity to control" a tenant. 123 A.D.2d at 592-93.

[43] *Davis*, 526 U.S. at 648.

and prosecution.[44] We therefore have no factual basis to infer that the

KPM Defendants clearly acted unreasonably.[45]

---

[44] Although "[l]andlords have a common-law duty to take minimal precautions to protect tenants from foreseeable harm, including foreseeable criminal conduct by a third person," *Mason v. U.E.S.S. Leasing Corp.*, 96 N.Y.2d 875, 878 (2001), courts have been careful to avoid imposing standards of conduct that would effectively make the landlord an arm of law enforcement. *See, e.g., Kline v. 1500 Mass. Ave. Apartment Corp.*, 439 F.2d 477, 485 (D.C. Cir. 1970) ("The landlord is not expected to provide protection commonly owed by a municipal police department."); *Gill v. N.Y.C. Hous. Auth.*, 130 A.D.2d 256, 267 (1st Dep't 1987) (holding that "arbitrarily . . . [assigning] a landlord . . . responsibility for the unprecedented acts of a mentally ill tenant over which the landlord has no control" would "create[] havoc with the landlord-tenant relationship, imposing upon the landlord unprecedented responsibilities having nothing to do with the proprietary function, and subjecting the tenant to a degree of scrutiny about his private affairs and insecurity about his living accommodation that is intolerable").

Scholars have also warned that broad liability regimes might place landlords in the role of "cops" who threaten their tenants with "unrestrained vigilantism." *See* B. A. Glesner, *Landlords as Cops: Tort, Nuisance & Forfeiture Standards Imposing Liability on Landlords for Crime on the Premises*, 42 Case W. L. Rev. 679, 791 (1992).

[45] To be clear, we both (1) decline to apply a deliberate indifference theory of liability under the FHA in the circumstances of this case because there were no factual allegations to suggest that the KPM Defendants exercised substantial control over Endres; and (2) decline to infer discriminatory intent from the KPM Defendants' alleged deliberate indifference to Francis's reports of harassment. A discrimination plaintiff may adequately plead that a defendant engaged in intentional discrimination through deliberate indifference to a third party's conduct where he plausibly alleges that the defendant's "[deliberate] indifference was such that the defendant intended the discrimination to occur." *Gant*, 195 F.3d at 141. Had Francis plausibly alleged that KPM's inaction occurred against a backdrop of consistently exercised control over tenants in roughly comparable

We think that our decision today coheres with the aims of those who are concerned about mounting housing costs for renters and increasing risks of housing loss for some of the most vulnerable among us.[46] The alternative pleading standard proposed by Francis would generate considerable uncertainty about the scope of a landlord's responsibility for tenant behavior. The prophylactic measures by which landlords would manage the ensuing uncertainty would come at a cost, one that would almost certainly be borne, in one form or another, by current and prospective renters.[47]

---

circumstances, it might be reasonable to infer that the KPM Defendants intended Endres's race-based harassment of Francis to occur. Instead, Francis alleges only that KPM intervened, with unspecified frequency and forcefulness, to address other unspecified violations of leases or of the law. Such allegations are insufficient as a matter of law to give rise to the inference that the KPM Defendants intended discrimination to occur.

[46] *Francis I*, 944 F.3d at 395 (Livingston, J., dissenting).

[47] Specifically, under the alternative proposed by Francis, tenants would conceivably bear rent increases (or suffer lower quality housing) that reflect the costs of enforcing antidiscrimination protocols, such as by hiring security staff. Further, prospective and current renters would confront more restrictive leases rife with *in terrorem* clauses, intensified tenant screening procedures, and intrusions

Finally, we note that laws making landlords legally responsible for discriminatory tenant misbehavior are conspicuously absent from the abundant and exemplary history of New York legislation designed to proscribe discrimination in housing.[48] If the legislative bodies of New York have not seen fit to impose such landlord liability, there is

---

into their dealings with neighbors, all of which could result in greater hostility and danger, even culminating in (or beginning with) unwarranted evictions.

Our holding should also be of special interest to those concerned with the evolution of surveillance by state actors or by those purporting to act at their direction. *See* Note 44, *ante* (warning against broad liability schemes that would encourage landlords to act as law enforcement).

[48] Long before the FHA was enacted, "[i]n 1939, the State of New York banned discrimination in publicly owned housing based upon a tenant's 'race, creed, color or national origin.'" Michael H. Schill, *Local Enforcement of Laws Prohibiting Discrimination in Housing: the New York City Human Rights Commission*, 23 Fordham Urb. L.J. 991, 1006 (1996) (citation omitted). In 1943, the New York City Council outlawed discrimination in any housing benefitting from tax exemptions, *id.* at 1006, and in 1955, the Commission on Intergroup Relations (the predecessor to the New York City Human Rights Commission) was founded, *id*. at 1005, beginning "its life primarily dedicated to promoting open housing for New York's racial and ethnic minorities," *id*. at 991. In 1957, the City Council enacted the nation's first law prohibiting discrimination in the private housing market: the Fair Housing Practices Law ("FHPL"). *Id*. at 991-92. This pathbreaking law aimed "to outlaw discrimination in housing based upon racial or ethnic characteristics," with "acts against black and Hispanic homebuyers and renters" of particular concern. *Id*. at 992. In 1961, the City Council amended the FHPL to ban discriminatory lending practices and discriminatory advertising, as well as to narrow previous exemptions. *Id*. at 1009.

good reason to doubt that it is a suitable tool for promoting fair housing. Contrary to the suggestions of a dissenting colleague, such observations do not indicate that our interpretation of the FHA improperly "puts a policy concern ahead of a legal mandate."[49] Rather, we stress the potentially dramatic and arguably undesirable implications of the panel's faulty interpretation of the FHA because it is improbable that such implications could have gone unnoticed for over fifty years after the passage of that much-discussed and much-litigated legislation.

We accordingly affirm the District Court's dismissal of Francis's intentional discrimination claim under the FHA pursuant to Rule 12(b)(6).[50]

---

[49] Lohier Dissent at 29-30

[50] Because the Complaint fails to allege intentional discrimination, we need not consider to what extent the FHA's prohibition of discrimination reaches conduct engaged in after a tenant acquires the dwelling. *Compare Francis I*, 944 F.3d at 377 (concluding that the FHA forbids conduct that "would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of

## II. Housing Discrimination Under Sections 1981 and 1982

Sections 1981 and 1982 reach "only purposeful discrimination."[51] Therefore, to state a claim under either Section 1981 or 1982 a plaintiff "must allege facts supporting [a defendant's] intent to discriminate against him on the basis of his race."[52] We conclude that Francis's allegations that the KPM Defendants discriminated against him because of his race are insufficient to support his claims under Sections 1981 and 1982 for the same reasons we conclude they were insufficient to state a claim under the FHA.

---

services associated with that dwelling after acquisition" (internal quotation marks omitted)), *with id*. at 387-89 (Livingston, J., dissenting) (noting holdings of courts of appeals limiting the post-acquisition reach of the FHA to conduct constituting constructive eviction).

[51] *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982) (interpreting Section 1981 in tandem with Section 1982 and holding that Section 1981 reaches only purposeful discrimination).

[52] *Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014).

We therefore affirm the District Court's dismissal of Francis's claims under Sections 1981 and 1982.

### III.    Housing Discrimination Under the NYSHRL

The NYSHRL makes it an unlawful discriminatory practice for a landlord to "discriminate against any person because of race . . . in the terms, conditions or privileges of the . . . rental or lease of any . . . housing accommodation or in the furnishing of facilities or services in connection therewith."[53] We have held that "[c]laims under the FHA and [NYS]HRL § 296 are evaluated under the same framework."[54] Because we conclude that Francis has failed to state a claim under the FHA, we conclude that he also fails to state a claim under Section 296(5) of the NYSHRL.

---

[53] N.Y. Exec. Law § 296(5)(a)(2).

[54] *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014) (internal quotation marks omitted).

New York law also provides that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article [including discrimination]."[55] "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim."[56] Even if we were to assume that Endres discriminated against Francis in violation of Section 296(5), Francis has failed to plead any facts indicating that the KPM Defendants in any way "actually participat[ed]" in or incited the predicate unlawful conduct so as to give rise to liability under the aiding and abetting provision of the NYSHRL.

---

[55] N.Y. Exec. Law § 296(6).

[56] *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (internal quotation marks omitted).

We therefore affirm the District Court's dismissal of Francis's NYSHRL claims.

IV.    Negligent Infliction of Emotional Distress

To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm.[57]

Francis has failed to plead that the KPM Defendants breached a duty owed to him. "The common law does not ordinarily impose a duty to prevent third parties from injuring others unless the defendant has the authority to control the conduct of such third parties."[58] In

---

[57] *See, e.g., Ornstein v. N.Y.C. Health & Hosps. Corp.*, 10 N.Y.3d 1, 6, (2008); *Taggart v. Costabile*, 131 A.D.3d 243, 252-53 (2d Dep't 2015). To establish the fourth element, the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety. *See Taggart*, 131 A.D.3d at 253.

[58] *Adelstein v. Waterview Towers, Inc.*, 250 A.D.2d 790, 791 (2d Dep't 1998).

other words, "[a] landlord has no duty to prevent one tenant from attacking another tenant unless it has the authority, ability, and opportunity to control the actions of the assailant."[59] But the Complaint does not allege that the KPM Defendants had the requisite "authority, ability, and opportunity to control" Endres.[60] Nor does the KPM Defendants' power to evict Endres "furnish [them] with a reasonable opportunity or effective means to prevent or remedy [Endres's] unacceptable conduct, since . . . the pattern of harassment alleged by the plaintiff[] arose from a purely personal dispute between the two individuals."[61] Francis has thus failed to state a claim of negligent infliction of emotional distress under New York law.

---

[59] *Britt v. N.Y.C. Hous. Auth.*, 3 A.D.3d 514, 514 (2d Dep't 2004).

[60] *Id.*

[61] *Id.* (internal quotation marks omitted).

Accordingly, we affirm the District Court's dismissal of Francis's claim of negligent infliction of emotional distress against the KPM Defendants.

## III. CONCLUSION

To summarize, we hold that:

(1) A landlord cannot be presumed to have the degree of control over tenants necessary to impose liability under the FHA for tenant-on-tenant harassment;

(2) Francis fails to state a claim that the KPM Defendants intentionally discriminated against him on the basis of race in violation of the FHA, Sections 1981 and 1982, or the NYSHRL; and

(3) Francis fails to state a claim of negligent infliction of emotional distress against the KPM Defendants under New York law.

36

For the foregoing reasons, we **VACATE** the panel decision and

**AFFIRM** the judgment of the District Court.

# <u>Appendix A</u>

## Filings by Additional *Amici Curiae*[1]

Kenneth M. Klemm, Baker Donelson Bearman Caldwell & Berkowitz, New Orleans, LA; Thomas S. Silverstein, Lawyers' Committee for Civil Rights Under Law, Washington, DC, *for Amicus Curiae* Lawyers' Committee for Civil Rights Under Law *in support of Plaintiff-Appellant*.

Karen L. Loewy, Lamda Legal Defense and Education Fund, Inc., New York, NY; Susan Ann Silverstein and Elizabeth A. Aniskevich, AARP Foundation, Washington, DC, *for Amici Curiae* AARP and AARP Foundation; Lambda Legal Defense and Education Fund, Inc.; Human Rights Campaign; Justice in Aging; Mobilization for Justice; National Disability Rights Network; and Services & Advocacy for GLBT Elders *in support of Plaintiff-Appellant*.

---

[1] *Amici Curiae* listed herein did not participate in oral argument.

Margaret A. Little and Richard Samp, New Civil Liberties Alliance, Washington, DC, *for Amicus Curiae* New Civil Liberties Alliance *in support of neither party*.

Thomas J. Moloney, Cleary Gottlieb Steen & Hamilton LLP, New York, NY; Juan Cartagena, Francisca D. Fajana, and Natasha Bannan, LatinoJustice PRLDEF, New York, NY, *for Amici Curiae* LatinoJustice PLDEF; Legal Aid Society; Empire Justice Center; Long Island Housing Services, Inc.; Community Service Society of New York; and Justice For All Coalition *in support of Plaintiff-Appellant*.

Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, Caroline A. Olsen, Assistant Solicitor General, *for* Letitia James, Attorney General for the State of New York, for *Amicus Curiae* the State of New York, *in support of Plaintiff-Appellant*.

Daniel Matza-Brown, Assistant Corporation Counsel, Richard Dearing, Claude S. Patton, *for* James E. Johnson, Corporation Counsel of the City of New York (New York, NY)) *for Amicus Curiae* the City of New York *in support of Plaintiff-Appellant*.

Heather R. Abraham, Brian Wolfman, Olivia Grob-Lipkis, Sara Hainbach, and Spencer Myers, Georgetown Law Civil Rights Clinic, Washington, DC, *for Amicus Curiae* Georgetown University Law Center Civil Rights Clinic *in support of Plaintiff-Appellant*.

Sherrilyn A. Ifill, Janaie S. Nelson, Samuel Spital, Kristen A. Johnson, Ashok Chandran, Kevin E. Jason, New York, NY, and Mahogane D. Reed, Washington, DC, NAACP Legal Defense and Educational Fund, Inc. *for Amicus Curiae* NAACP Legal Defense and Educational Fund, Inc. *in support of Plaintiff-Appellant.*

Dena Elizabeth Robinson, Public Justice Center, Baltimore, MD, *for Amici Curiae* Paralyzed Veterans of America and Public Justice Center *in support of Plaintiff-Appellant.*

Devi M. Rao, Washington, DC, and Emily Mannheimer, New York, NY, Jenner & Block LLP; Sandra S. Park and Lunda Morris, ACLU Women's Rights Project, New York, NY; Sunu P. Chandy and Amy Matsui, National Women's Law Center, Washington, DC; Molly K. Bilken and Antony P.F. Gemmell, New York Civil Liberties Union Foundation, New York, NY, *for Amici Curiae* American Civil Liberties Union; New York Civil Liberties Union; National Women's Law Center; and Other Organizations Referred to in the Appendix to the *Amicus* Brief *in support of Plaintiff-Appellant.*

Diane L. Houk and David B. Berman, Emery Celli Brinkerhoff & Abady LLP, New York, NY; Stephen M. Dane, Dane Law LLC, Perrysburg, OH, *for Amici Curiae* National Fair Housing Alliance; Fair Housing Justice Center; Connecticut Fair Housing Center;

Westchester Residential Opportunities; CNY Fair Housing; and Erase Racism *in support of Plaintiff-Appellant*.

DENNY CHIN, *Circuit Judge*, joined by ROSEMARY S. POOLER, ROBERT A. KATZMANN, RAYMOND J. LOHIER, JR., and SUSAN L. CARNEY, *Circuit Judges*, dissenting in part and concurring in part.

I join fully in Judge Lohier's thorough and compelling opinion dissenting in part and concurring in part. I write separately to address one matter: the contrast between the Court's disposition of this case and its disposition of another case, *Mandala v. NTT Data, Inc.*, No. 19-2308.

Both the instant case and *Mandala* are civil rights cases in which the district court dismissed the complaint at the pleadings stage. In both cases, the district court concluded that the complaint failed to state a plausible claim for relief, granting a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

On appeal, the two cases took a different course. In *Mandala*, a Title VII case, a panel of this Court affirmed, over my dissent. *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020). I was so troubled by the decision that I called for an *en banc* poll, only the second time that I have done so in my more than ten years on the Court. I called for rehearing *en banc* because I believed the panel majority got it wrong, its decision raised the pleading standard in Title VII

cases in disregard of controlling case law, and the issues presented were of exceptional importance. By a bare majority, the Court denied the petition for rehearing *en banc*, leaving in place a panel decision that concluded that all that was at stake was the simple application of pleading standards, and holding that plaintiffs should have alleged more than they did. *Mandala v. NTT. Data, Inc.*, 988 F.3d 664 (2d Cir. 2021); *id*. at 665-69 (Sullivan and Nardini, *JJ.*, concurring).

In this case, on appeal, a panel of this Court reversed, vacating the district court's dismissal of the complaint and concluding that Francis stated a plausible claim that his rights under the Fair Housing Act had been violated. *See Francis v. Kings Park Manor, Inc.*, 944 F.3d 370, 373 (2d Cir. 2019). By a bare majority, the Court granted the petition for rehearing *en banc*, apparently concluding that there was something *more* than the mere application of pleading standards at stake. *Francis v. Kings Park Manor, Inc.*, 949 F.3d 67 (2d Cir. 2020). And now, by a seven-to-five vote, the Court affirms the judgment dismissing Francis's civil rights claims -- and holding that he should have alleged more.

Although the Court takes a different path in the two cases -- denying the petition for rehearing *en banc* in *Mandala* and granting the petition for rehearing *en banc* in *Francis* -- it arrives at the same place: imposing a heightened

pleading standard in a civil rights case that "shuts the courthouse door" to what may very well be meritorious claims of discrimination. *See* Pet. for Reh'g at 16, *Mandala v. NTT Data, Inc.*, No. 19-2308, Dkt. No. 131. In both cases, instead of drawing all reasonable inferences in *favor* of plaintiffs, the Court draws inferences *against* them.

In *Mandala*, the panel majority drew the inference that the applicant pool at NTT Data, Inc. ("NTT") may be so different from the general population, because of the "confounding variable" of education, that general population statistics cannot be considered, even at the pleadings stage. *See Mandala*, 975 F.3d at 211. It further assumed that the racial disparities in arrest and conviction rates that exist nationally and in every state somehow do not exist at NTT. *Id*. at 211-12. In denying the petition for rehearing *en banc*, the Court permitted these rulings to stand.

In *Francis*, the Court now draws the inference that the landlord lacked substantial control over the offending tenant, even where the complaint plausibly alleged that the terms of the lease and New York law gave the landlord the ability -- indeed, the obligation -- to control the tenant. Majority Op. at 18-19. The *en banc* majority ignores Francis's well-pleaded allegations regarding control

and decides instead to make its own presumptions about "the typical[] arms-length relationship between landlord and tenant" and the "typical powers of a landlord over a tenant." Majority Op. at 19-20. Further, instead of drawing the reasonable inferences in favor of Francis -- that it is unreasonable to intentionally disregard and ignore repeated requests to take action against a tenant who engaged in harassing conduct so egregious it rose to a criminal level -- the *en banc* majority draws the inference against him, concluding that because the "KPM Defendants were aware that the police were involved, and indeed, the police conducted an investigation that ultimately led to Endres's arrest and prosecution," their inaction may have been reasonable. Majority Op. at 26-27. Even assuming both inferences are plausible, however, at the motion to dismiss stage, the Court is obliged to draw the inference that favors Francis.

Of course, both Title VII and the Fair Housing Act are broad remedial statutes, "enacted to eradicate discriminatory practices" in employment and housing. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539 (2015); *accord Washington County v. Gunther*, 452 U.S. 161, 170 (1981) ("Title VII's prohibition of discriminatory employment practices was intended to be broadly inclusive . . . . The structure of Title VII litigation, including

4

presumptions, burdens of proof, and defenses, has been designed to reflect this approach.") (citation omitted); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (referring to the "broad remedial intent of Congress embodied in the [Fair Housing] Act"). In both *Mandala* and *Francis*, plaintiffs came forward with specific, concrete claims of racial discrimination. The national statistics and individual circumstances in *Mandala* and the offending tenant's guilty plea to harassment and the provisions of the lease and state law in *Francis* surely helped push the plaintiffs' claims over the line from conceivable to plausible. And yet, instead of heeding Congress's intent that the civil rights statutes be broadly applied, the Court turns the plaintiffs away. In doing so, the Court has inconsistently applied the legal standards for determining when to rehear a case *en banc*. More troubling, however, is that, taken together, the two cases make it more difficult for plaintiffs with meritorious civil rights claims to have their day in court.

RAYMOND J. LOHIER, JR., *Circuit Judge*, joined by ROSEMARY S. POOLER, ROBERT A.

KATZMANN, DENNY CHIN, and SUSAN L. CARNEY, *Circuit Judges*, dissenting in part

and concurring in part:

Over fifty years ago, Congress pried open the door to racial equality in

housing by passing Title VIII of the Civil Rights Act of 1968, commonly referred

to as the Fair Housing Act of 1968 (FHA), 42 U.S.C. § 3601 <u>et</u> <u>seq.</u>  This appeal

asks us principally to consider whether a tenant has plausibly alleged that his

landlord is liable for intentional discrimination under the FHA, the Civil Rights

Act of 1866, and the New York State Human Rights Law (NYSHRL) for refusing

to address what it knew was an extended campaign of racial terror carried out

against the tenant by another tenant.  Worse still, the landlord had acted against

other tenants to redress prior, non-race-related issues in the past.

Given the clear text and broad legislative intent to stamp out racial

discrimination that anchors the FHA and related federal and state statutes, the

straightforward answer to the question before us should have favored the

harassed tenant, Donahue Francis, the plaintiff in this case.  In my view, Francis's

complaint clearly satisfies the very minimal burden for pleading discriminatory

intent that we have until today imposed.  But the majority instead favors the

1

landlord. It does so on the narrow ground that Francis failed to allege facts that might lead a reasonable juror to decide that the landlord's inaction was motivated by race. And it does so even though the majority opinion itself assumes a landlord may be liable for being deliberately indifferent to the general circumstances Francis alleges. With no change in law or circumstance, without reason or justification, the majority raises the pleading bar imposed on victims of racial discrimination in this Circuit. By requiring Francis at the very start of his case to plead more than he has, the Court closes the door to a legitimate claim of housing discrimination.

Except for the majority's affirmance of the dismissal of Francis's claim of negligent infliction of emotional distress, I respectfully dissent.

BACKGROUND

We accept as true the allegations of harassment in the complaint, together with the documents incorporated by reference therein. See Morales v. City of New York, 752 F.3d 234, 236 (2d Cir. 2014). They tell a story that remains too common today.

In 2010 Francis signed a rental lease agreement with Defendant-Appellee

Kings Park Manor, Inc. ("KPM").[1]  The lease provided that Francis "shall

peaceably and quietly have, hold and enjoy the Premises during the term of this

Lease," and required that "Tenant . . . not allow or commit any objectionable or

disorderly conduct . . . that disturbs or interferes with the rights, comforts or

conveniences of other residents."[2]  Francis then moved into an apartment unit of

a complex owned by KPM and managed by Corrine Downing (together with

KPM, the "KPM Defendants").

Starting in February 2012, Raymond Endres, Francis's next-door neighbor,

began a relentless campaign of racial and religious harassment, abuse, and

threats.  Among other things, Endres repeatedly called Francis, who is African

American, a "fucking nigger"[3] and complained about "fucking Jews," including

---

[1] Francis entered the lease agreement pursuant to the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), commonly known as the "Section 8" public housing program.

[2] Francis's lease, like all residential leases under New York law, contained an implied warranty of habitability, which requires that "occupants will not be subjected to conditions that are dangerous, hazardous or detrimental to their life, health or safety." Solow v. Wellner, 86 N.Y.2d 582, 587–88 (1995) (quotation marks omitted).

[3] For a brief history of this odious, violent word, see RANDALL KENNEDY, NIGGER: THE STRANGE CAREER OF A TROUBLESOME WORD (2002).

while Francis was in his apartment with his front door open and in the parking lot of the apartment complex. On March 10, Francis overheard Endres and another tenant discussing Francis "in derogatory terms." The next day, Endres approached Francis's open front door, repeatedly called him a "nigger," and then stated, "fucking nigger, close your god-darn door, fucking lazy, god-damn fucking nigger." On at least one occasion in May, Endres even told Francis, "I oughta kill you, you fucking nigger." On yet another occasion that month, Endres approached Francis, who was leaving his apartment, and said, "keep your door closed you fucking nigger." In August, Endres called Francis a "fucking nigger" and a "black bastard." And on September 2, Endres stood in Francis's open front door and photographed the interior of Francis's apartment.

Needless to say, Francis was terrified. He felt "unwelcome in his own home" and "uncomfortable walking in the common areas at Kings Park Manor." In response, Francis repeatedly contacted the KPM Defendants, as well as the police. His first call to the police on March 11 prompted Suffolk County Police Hate Crimes Unit officers to visit the KPM apartment complex, interview witnesses, and warn Endres to stop threatening Francis with racial epithets. That

4

same day Francis also filed a police report, and a police officer told the KPM Defendants about Endres's conduct. The KPM Defendants did nothing.

In May 2012 Francis called the police again and filed another police report. This time, by certified letter dated May 23, 2012, Francis notified the KPM Defendants directly about Endres's racist conduct between March and May 2012. That letter reported Endres for "racial harassment," and for making "racial slurs to [Francis]," and provided contact information for the Suffolk County police officers responsible for investigating Endres. Joint App'x 33. Again, the KPM Defendants failed to respond at all.

Endres's conduct persisted. His escalating racial threats to Francis finally prodded the Suffolk County Police Department to arrest Endres on August 10, 2012 for aggravated harassment in violation of New York Penal Law § 240.30. That same day, Francis sent a second certified letter to the KPM Defendants. It informed the KPM Defendants that Endres continued to direct racial slurs at Francis and "anti-semitic, derogatory slurs against Jewish people." It also disclosed that Endres had recently been arrested for harassment.

After Endres attempted to photograph Francis's apartment on September 2, Francis contacted the police. The following day he sent the KPM

Defendants a third and final certified letter complaining about Endres's continued racial harassment. When it received the letter, KPM advised Downing "not to get involved." Joint App'x 16. So the KPM Defendants again declined to respond or follow up on Francis's complaints, even though they had previously "intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law." Joint App'x 20. As a result, Endres lived at the apartment complex without any warning, reprimand, or so much as a word from the KPM Defendants until his lease expired in January 2013.

That month, Endres moved out of his apartment. A few months later, in April 2013, Endres pleaded guilty to harassment in violation of New York Penal Law § 240.26(1). That same month, the State court entered an order of protection prohibiting him from contacting Francis.

Francis sued the KPM Defendants and Endres, claiming primarily that they violated §§ 3604 and 3617 of the FHA and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and that the KPM Defendants violated § 296(5) of the NYSHRL, N.Y. Exec. Law § 296(5), which bars housing discrimination in New York. Francis also sued the KPM Defendants and Endres for negligent infliction

6

of emotional distress and for violating NYSHRL § 296(6) by aiding and abetting a violation of NYSHRL § 296(5), the KPM Defendants for breach of contract and breach of the implied warranty of habitability under New York State law, and Endres for intentional infliction of emotional distress. The District Court entered a default judgment against Endres, who never appeared. The KPM Defendants moved under Rule 12(b)(6) to dismiss the claims against them for failure to state a claim. As relevant here, the District Court granted that motion and then granted partial final judgment in favor of the KPM Defendants so that Francis could pursue this appeal, even though damages against Endres remained to be determined. See Fed. R. Civ. P. 54(b).

The panel majority vacated the District Court's dismissal of the federal claims and the NYSHRL claims and remanded for further proceedings. See Francis v. Kings Park Manor, Inc., 944 F.3d 370 (2d Cir. 2019). The Court then reheard the appeal in banc, and the in banc majority now affirms the District Court's dismissal of all of Francis's claims.

## DISCUSSION

We consider the allegations in Francis's complaint in the light most favorable to Francis. The principal question before us is whether Francis has

7

plausibly alleged that the KPM Defendants engaged in intentional discrimination under §§ 3604 and 3617 of the FHA. The majority opinion holds that Francis failed to state a claim under these provisions. For similar reasons, the majority opinion holds that Francis also failed to state a claim under the Civil Rights Act of 1866 or the NYSHRL.

I disagree.

I.    The FHA

A. Post-Acquisition Claims Under the FHA

The majority opinion assumes that the FHA's prohibitions apply to post-acquisition conduct. See Majority Op. at 30 n.50. Instead of merely assuming the FHA applies to post-acquisition conduct, I would squarely hold that it does.

The plain text of the FHA prohibits discriminatory conduct that occurs after a plaintiff buys or rents housing—what the caselaw refers to as "post-acquisition" conduct—in at least some circumstances. The initial panel dissent in this case, authored by a member of the majority in banc, agreed with this proposition. See Francis, 944 F.3d at 386 (Livingston, C.J., dissenting) ("The majority reassures that there is no circuit split on whether § 3604 reaches post-acquisition conduct. I agree." (quotation marks omitted)). No active member of

8

this Court has signaled disagreement with this principle.  And all eleven amici

on rehearing in banc that take a position on the issue concur that the FHA

extends to post-acquisition conduct.[4]  Some, like the federal Government, advise

us again and again that the FHA covers "post-acquisition liability" and go

further by imploring us specifically to "reject any atextual limitations on that

liability, such as constructive eviction."  Oral Arg. Tr. at 35:6-8; see Brief for the

---

[4] See Brief for the State of New York as Amicus Curiae Supporting Plaintiff-Appellant at 5–6 (the panel dissent "errs in attempting to limit § 3604(b)'s post-acquisition scope to conduct that results in constructive eviction" because the FHA covers more extensive post-acquisition conduct); Brief for Debo Adegbile as Amicus Curiae Supporting Plaintiff-Appellant at 5 ("[T]he FHA unambiguously prohibits intentional discrimination against a tenant after he obtains housing."); Brief for the City of New York as Amicus Curiae Supporting Plaintiff-Appellant at 6; Brief for Nat'l Fair Hous. All. et al. as Amici Curiae Supporting Plaintiff-Appellant at 7–10 (urging this Court to join the "uniform holdings of its sister circuits" that the FHA bars post-acquisition discriminatory conduct); Brief for the ACLU et al. as Amici Curiae Supporting Plaintiff-Appellant at 16; Brief for LatinoJustice PRLDEF et al. as Amici Curiae Supporting Plaintiff-Appellant at 11; Brief for Georgetown Univ. L. Ctr. C.R. Clinic as Amicus Curiae Supporting Plaintiff-Appellant at 11 (the FHA holds landlords liable for "negligently allowing a hostile environment"); Brief for Paralyzed Veterans of Am. & Pub. Just. Ctr. as Amici Curiae Supporting Plaintiff-Appellant at 4–10 (a landlord's duty to address tenant-on-tenant harassment is consistent with the FHA's intent to end harassment and segregation); Brief for AARP et al. as Amici Curiae Supporting Plaintiff-Appellant at 23–29 (landlords are liable for failing to take corrective action for discriminatory tenant-on-tenant harassment); Brief for Laws.' Comm. for C.R. Under L. as Amicus Curiae Supporting Plaintiff-Appellant at 6.  The remaining two amici did not address the issue. See Brief for the NAACP Legal Def. and Educ. Fund as Amicus Curiae Supporting Plaintiff-Appellant at 3–5 (arguing that Francis stated a claim for post-acquisition housing discrimination under the Civil Rights Act of 1866 without addressing the FHA); Brief for New C.L. All. as Amicus Curiae on Behalf of Neither Party at 6 n.4 (noting that this Court has not reached the question of whether the FHA covers post-acquisition conduct and taking no position on the issue).

United States as Amicus Curiae Supporting Neither Party at 14–15, 21 (the FHA prohibits post-acquisition housing discrimination and courts should not limit the statute's reach "with alternative terminology not found in the text of the FHA (i.e., concepts such as 'constructive eviction')"). The KPM Defendants, meanwhile, note only that the post-acquisition scope of the FHA is, in their view, an open question in this Circuit. See Appellees' Br. at 31.

Without belaboring the point, there are four reasons why widespread agreement exists on this issue.

First, the text of the FHA plainly provides for coverage of post-acquisition conduct. Section 3604(b) prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b). The words "conditions," "privileges," and "provisions of services or facilities" refer not just to the sale or rental itself, but to benefits and protections following the sale or rental. See Bloch v. Frischholz, 587 F.3d 771, 779–80 (7th Cir. 2009) (en banc); see also Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 713 (9th Cir. 2009). As the United States asserted at oral argument in this case, "by definition, a rental creates an ongoing legal relationship between a landlord and

10

a tenant for a term, [and] phrases like 'terms, conditions, or privileges' need to be interpreted using the ordinary plain language." Oral Arg. Tr. at 35:18–21.

Second, the plain language of § 3617 creates a separate cause of action that more comprehensively prohibits post-acquisition discriminatory conduct barred by § 3604(b). Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604." 42 U.S.C. § 3617. As the Seventh Circuit observed, "[c]oercion, intimidation, threats, or interference with or on account of a person's exercise of his or her [§ 3604(b)] rights can be distinct from outright violations of [§ 3604(b)]." Bloch, 587 F.3d at 782.

Third, any contrary interpretations of §§ 3604(b) and 3617 would contravene Congress's central intent to use the FHA to root out discrimination in housing. See Cabrera v. Jakabovitz, 24 F.3d 372, 390 (2d Cir. 1994) (rejecting a defendant's "crabbed reading" of the FHA for failing to comport with the statute's "broad legislative plan to eliminate all traces of discrimination within the housing field" (quotation marks omitted)).

11

Finally, all seven sister circuits that have addressed the issue have acknowledged that § 3604(b) prohibits at least some post-acquisition conduct. Cox v. City of Dallas, 430 F.3d 734, 746 (5th Cir. 2005); see Bloch, 587 F.3d at 772; Modesto, 583 F.3d at 714; Ga. State Conf. of the NAACP v. City of LaGrange, 940 F.3d 627, 631–33 (11th Cir. 2019); Honce v. Vigil, 1 F.3d 1085, 1088–90 (10th Cir. 1993); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 985–86 (4th Cir. 1984); see also Mich. Prot. & Advoc. Serv., Inc. v. Babin, 18 F.3d 337, 347 (6th Cir. 1994); Brief for Debo Adegbile as Amicus Curiae Supporting Plaintiff-Appellant at 10–15 (describing the uniform view of "all circuit courts to have considered the issue" that the FHA bars post-acquisition discriminatory conduct).[5]

Although the proposition that the FHA bans post-acquisition discriminatory conduct in housing is beyond serious dispute, the majority opinion merely assumes it, declining to decide an issue as to which seven circuits and the federal Government are in full agreement.

---

[5] We thank Mr. Debo Adegbile, Esq., who sought court-appointment and oral argument, for his outstanding service as court-appointed amicus curiae. The inaccurate claims of counsel for the KPM Defendants notwithstanding, see Appellees' Sur-Reply at 2–3; Oral Arg. Tr. at 70:11–17, the Court also secured amicus briefing in support of the KPM Defendants from New Civil Liberties Alliance, which did not seek court-appointment or oral argument, and which also deserves our great appreciation.

B.  <u>Pleading Standards: Intentional Discrimination</u>

The principal question on rehearing in banc is thus fairly limited:  Do the allegations in Francis's particular complaint plausibly plead a claim against the KPM Defendants for intentional discrimination under the FHA and related federal and state statutes?  Because this appeal arises from a successful motion to dismiss Francis's complaint under Rule 12(b)(6), we accept all factual allegations in the complaint (and documents incorporated by reference therein) as true and draw all reasonable inferences in Francis's favor.  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face.

In assessing the adequacy of Francis's complaint, we start with <u>Littlejohn v. City of New York</u>, 795 F.3d 297 (2d Cir. 2015).  There we held that because the filing of a complaint "by definition[] occurs in the first stage of the litigation," a "plaintiff cannot reasonably be required to allege more" than minimal facts to support an inference of discriminatory intent.  <u>Id.</u> at 311.  In <u>Vega v. Hempstead Union Free School District</u>, 801 F.3d 72 (2d Cir. 2015), we elaborated on <u>Littlejohn</u>, emphasizing that the burden placed on the plaintiff on a motion to dismiss is exceedingly minimal.  "[T]he question is not whether a plaintiff is

13

likely to prevail, but whether the well-pleaded factual allegations plausibly give rise to an inference of unlawful discrimination, i.e., whether plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" Id. at 87 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard thus "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 556); see Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir. 2018) (for plaintiffs to "'nudge[ ] their claims across the line from conceivable to plausible,' they must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of these facts is improbable'" (quoting Twombly, 550 U.S. at 556, 570)).

A plaintiff claiming discrimination is not required to plead a prima facie case under the McDonnell Douglas framework. See Vega, 801 F.3d at 84. "Rather, because a temporary presumption of discriminatory motivation is created under the first prong of the McDonnell Douglas analysis, a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." Id. (quotation marks omitted); see id. at 85 (requiring only

14

"minimal support for the proposition that the [defendant] was motivated by discriminatory intent" (quotation marks omitted).[6] We have since reaffirmed the importance of this minimal pleading standard. See, e.g., Doe v. Columbia Univ., 831 F.3d 46, 55–56 (2d Cir. 2016) (applying a minimal pleading burden for sex discrimination claims under Title IX and concluding that the "temporary presumption in a plaintiff's favor reduces the plaintiff's pleading burden, so that the alleged facts need support only a minimal inference of bias").

Consistent with Littlejohn and Vega, Francis's complaint plainly asserts that the KPM Defendants engaged in intentional racial discrimination. To start, the KPM Defendants are generally alleged to have "discriminat[ed] against [Francis] by tolerating and/or facilitating a hostile environment." Joint App'x 19. As factual support for this proposition, the complaint specifically alleges that KPM had the authority to "counsel, discipline, or evict [Endres] due to his continued harassment of [Francis]." Indeed, the complaint alleges, the defendants had "intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law." Joint App'x 20. This

---

[6] See also Littlejohn, 795 F.3d at 308 ("[T]he standard espoused by the McDonnell Douglas line of cases for prima facie sufficiency was an evidentiary standard, not a pleading requirement." (quotation marks omitted)).

15

suggests not only a material level of control over their tenants, but also that the KPM Defendants decided whether to intervene in tenant-related disputes "based on race." If merely alleging that the plaintiff in an employment discrimination case "was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the . . . pleading stage," Littlejohn, 795 F.3d at 313, then surely nothing more was required of Francis at the same stage in his housing discrimination case.

While contesting the adequacy of Francis's complaint, the majority opinion leaves largely unchallenged the allegation that the KPM Defendants were aware of the hostile housing environment created by Endres's criminal racial harassment. Relying on the McDonnell Douglas evidentiary framework, however, it holds that the complaint "lacks even minimal support for the proposition that the KPM Defendants were motivated by discriminatory intent." Majority Op. at 14 (quotation marks omitted). In particular, the majority labels as "conclusory" Francis's assertion that "[a]ccording to the New York State Division of Human Rights Investigator's File, the KPM Defendants have intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law"—the allegation that best suggests the

16

defendants' racially selective enforcement of lease violations.  Joint App'x 20.

"To hold that Francis has plausibly pleaded discriminatory intent on these facts,"

the majority submits, "would be to indulge the speculative inference that

'because the KPM Defendants did <u>something</u> with regard to <u>some</u> incident

involving <u>some</u> tenant at <u>some</u> past point,' racial animus explains the failure to

intervene here."  Majority Op. at 15.  These criticisms aim only to avoid the fair

application of our decisions in <u>Littlejohn</u> and <u>Vega</u>.

The majority's attack on Francis's pleading is flawed for at least two basic

reasons.  First, it overlooks the fact that a plaintiff's pleading (rather than

evidentiary) burden in FHA cases is minimal.  It confuses plausibility with

probability.  In the pre-acquisition context, we do not even require evidence that

non-protected-class members were treated more favorably than members of the

protected class to establish a prima facie case.  <u>See, e.g.</u>, <u>Mitchell v. Shane</u>, 350

F.3d 39, 47 (2d Cir. 2003).  Second, the majority misapplies the pleading standard

set out in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), and <u>Twombly</u> by demanding

significantly more than the short and plain statement of the claim under Rule 8 of

the Federal Rules of Civil Procedure.  The majority faults Francis for failing to

"provide enough information"—thereby conceding that he provided some—"to

17

compare the events of which Francis complains to the KPM Defendants'
responses to other violations." Majority Op. at 14–15.

Together or alone, these two flaws in the majority opinion result in a
heightened pleading standard that is more demanding even than the evidentiary
standard at summary judgment, let alone on a motion to dismiss.

To satisfy the plausibility threshold in a suit under the FHA, a plaintiff is
under no obligation to allege facts demonstrating that the defendant more likely
than not engaged in intentional discrimination. That is part of the <u>entire point</u> of
the minimal pleading standard, and any contrary view confuses plausibility with
likelihood or probability. <u>See</u> <u>Vega</u>, 801 F.3d at 87; <u>cf.</u> <u>Twombly</u>, 550 U.S. at 556
("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that
actual proof of those facts is improbable" and chances of recovery remote
(quotation marks omitted)); <u>Citizens United</u>, 882 F.3d at 380. The majority pays
lip service to the lower standard but ultimately casts it aside in favor of a
materially higher pleading burden.

Recall that the Supreme Court in <u>Twombly</u> and <u>Iqbal</u> adopted the
plausibility standard in the context of interpreting Rule 8. The rule provides, in
relevant part, that "[a] pleading that states a claim for relief must contain: . . . a

18

short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The majority's insistence on more (and more and more) particular information with respect to a core allegation in this case contradicts that standard and veers significantly from our decisions in Littlejohn and Vega. It also violates a central tenet of Swierkiewicz v. Sorema N.A., from which those two decisions were derived, and in which the Supreme Court pronounced that the "Federal Rules do not contain a heightened pleading standard for employment discrimination suits." 534 U.S. 506, 515 (2002). There is no reason to believe that suits under the FHA are any different for this purpose. Any "requirement of greater specificity" for FHA discrimination claims is thus "a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." Id. (quotation marks omitted).

Twombly and Iqbal may have wrought a number of changes, including replacing the notice pleading standard in Swierkiewicz with the plausibility pleading standard that our decisions in Littlejohn and Vega faithfully applied. But neither of these decisions requires, as the majority does here, a particularized pleading of discriminatory intent, such as we normally reserve for fraud claims under Rule 9, rather than a "short and plain" identification of what is alleged to

19

have had happened, as Rule 8 requires.  In the post-<u>Iqbal</u> case of <u>Swanson v. Citibank, N.A.</u>, for example, the Seventh Circuit held that a complaint for discrimination under the FHA was sufficient because it identified "the type of discrimination that [the plaintiff] thinks occur[red] (racial), by whom . . ., and when (in connection with her effort in early 2009 to obtain a home-equity loan). This is all that she needed to put in the complaint."  614 F.3d 400, 405 (7th Cir. 2010).

Under the correct application of these pleading standards, Francis has provided at least "minimal support for the proposition" that the KPM Defendants' refusal to intervene was motivated by race.[7]  <u>See</u> <u>Vega</u>, 801 F.3d at 85 (quotation marks omitted); <u>Wetzel v. Glen St. Andrew Living Cmty., LLC</u>, 901 F.3d 856, 864 (7th Cir. 2018).  The majority worries that this view and "the panel's ruling, if undisturbed, would significantly expand landlord liability" with "the probable result of fundamentally restructuring the landlord-tenant relationship." Majority Op. at 14 n.20.  But if that is true, how to explain that not one landlord or landlord advocacy group submitted an amicus brief denouncing the panel majority opinion or supporting the KPM Defendants?  Why was the only amicus

---

[7] The KPM Defendants have never claimed that they misunderstood what Francis's allegations meant or the basis for them.

20

brief from a landlord in this case filed in support of Francis? <u>See</u> <u>generally</u> Brief

for the City of New York as Amicus Curiae Supporting Plaintiff-Appellant.[8]

Ultimately, the majority disparages the congressionally determined balance

between landlords and tenants on matters of racial equality as reflected in the

FHA itself. In my view, our judicial role is to enforce that balance, whether we

like it or not.

Because the majority rejects Francis's plausible, well-pleaded allegations

on illegitimate grounds that end this litigation, I respectfully dissent.

C. <u>Pleading Standards: Deliberate Indifference</u>

Francis argues that he separately alleged KPM's deliberate indifference to

complaints of race-based harassment. <u>See</u> <u>Davis v. Monroe Cnty. Bd. of Educ.</u>,

526 U.S. 629, 643 (1999). I agree.

We have explained that a defendant's deliberate indifference to racial

harassment serves as "proof of racially discriminatory intent." <u>Gant v.</u>

<u>Wallingford Bd. of Educ.</u>, 195 F.3d 134, 139–40 (2d Cir. 1999). That is because

---

[8] Aside from this purely speculative policy concern, my colleagues in the majority who voted to proceed in banc leave unanswered why the very limited issue before us (whether the specific allegations in a complaint satisfy the plausibility pleading standard) still qualifies as a "question of exceptional importance." <u>See</u> Fed. R. App. P. 35(a)(2) ("An en banc . . . rehearing is not favored and ordinarily will not be ordered unless . . . the proceeding involves a question of exceptional importance.").

deliberate indifference consists of "a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." Reynolds v. Giuliani, 506 F.3d 183, 193 (2d Cir. 2007). Thus, "deliberate indifference to [known] harassment can be viewed as discrimination by [defendants] themselves." Gant, 195 F.3d at 140. As with other civil rights statutes, deliberate indifference is a theory of liability for a discrimination claim under the FHA.[9] In rejecting Francis's FHA claim, even the majority opinion appears to recognize (correctly) that this familiar theory of liability applies to the FHA.

The elements of a claim of deliberate indifference to a third party's harassment are straightforward: (1) the defendant had substantial control over the harasser, (2) the harassment was severe and discriminatory, (3) the defendant had actual knowledge of the harassment, and (4) the defendant's response was

---

[9] To suggest otherwise would render the FHA, a central civil rights statute, an outlier among civil rights statutes. See Wetzel, 901 F.3d at 863–64 (concluding that the FHA prohibits a landlord's deliberate indifference to known harassment because, among other reasons, Title IX is "comparable" to the FHA and "[m]uch of what the [Supreme] Court said [about discriminatory harassment in the Title IX context] can be applied readily to the housing situation"); see also, e.g., Davis, 526 U.S. at 648–49 (Title IX); Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 664–66 (2d Cir. 2012) (Title VI); Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 115 (2d Cir. 2001) (Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act); Gant, 195 F.3d at 140–41 (§ 1981); cf. Farmer v. Brennan, 511 U.S. 825, 847 (1994) (Eighth Amendment); Charles v. Orange County, 925 F.3d 73, 86–87 (2d Cir. 2019) (Fourteenth Amendment substantive due process); DiStiso v. Cook, 691 F.3d 226, 240–41 (2d Cir. 2012) (Fourteenth Amendment equal protection).

22

clearly unreasonable. Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 665–66 (2d Cir. 2012) (citing Davis, 526 U.S. at 643–50).

Francis satisfied each of these elements on any fair reading of his complaint. First, Francis explicitly alleged that the KPM Defendants "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." Davis, 526 U.S. at 645. Specifically, he alleged that Endres's lease with KPM authorized KPM to "counsel, discipline, or evict [Endres] due to his continued harassment of [Francis]." Joint App'x 19–20. He also alleged that Endres's racial harassment was not just severe but criminal. Finally, the KPM Defendants knew that racial harassment had occurred, yet they deliberately declined to do anything about it.

The majority disputes only that Francis's pleading satisfies the first element, that KPM could exercise substantial control over Endres, or that it satisfies the final element, that KPM's response to the harassment in this case was inadequate. I address each of these elements in turn on the assumption that they involve New York law.

1. <u>The Landlord's Substantial Control</u>

As an initial matter, Francis satisfied the substantial control element by alleging that the KPM Defendants could have exercised substantial control over and even evicted Endres under its lease. <u>See</u> Joint App'x 20 ("According to the New York State Division of Human Rights," the KPM Defendants previously had "intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law."). The KPM Defendants' prior interventions, if true, plausibly suggest that the KPM Defendants retained the power to discipline tenants for violating the terms of their leases.

The majority opinion disagrees, holding that Francis failed to plead deliberate indifference because the KPM Defendants lacked substantial control over Endres or any of its tenants as a matter of state law. Going further, the majority opinion announces a "clear" rule under New York law that landlords have "no general duty to protect tenants" from other tenants because "the 'power to evict cannot be said to . . . furnish'" control over the offending tenant.

24

Majority Op. at 23 (quoting Blatt v. N.Y.C. Hous. Auth., 506 N.Y.S.2d 877, 879

(2d Dep't 1986)).[10]

To be sure, "[w]here the basis of liability" under New York law "is a claim

that the landlord failed to protect one tenant from the aggression of another

tenant, it must first be established that the landlord had the ability and a

reasonable opportunity to control the aggressor' and that 'the harm complained

of was foreseeable.'" Reinert v. 291 Pleasant Ave., L.L.C., 938 N.Y.S.2d 229 (App.

Term. 2011) (table) (quoting Hughes v. City of New York, 656 N.Y.S.2d 649, 649

(2d Dep't 1997)); see Luisa R. v. City of New York, 686 N.Y.S.2d 49, 53 (1st Dep't

1999). But this means that New York law contemplates, more flexibly than the

majority allows, that a landlord's duty to address a discriminatory housing

practice carried out by another resident will depend largely on the facts. What is

the extent of the landlord's actual level of control over the resident in a particular

case? Determining the actual degree of a landlord's control turns principally on

the terms of the tenant's lease, the rights and obligations imposed by state law on

_____

[10] In support of this view, the majority compares the level of control by a landlord over tenants with an employer's control over its employees. The comparison to employers is a red herring. It is true that "an employer's manner and degree of control over its agent-employees" differs, sometimes markedly, from "that of a landlord over its tenants." Majority Op. at 21–22. But those differences do not mean that landlords can never control their tenants regardless of the circumstances.

25

landlords and tenants, and the landlord's prior history of remedial action, all with the understanding that the landlord need not have "[c]ontrol in the absolute sense." Wetzel, 901 F.3d at 865. It depends, in other words, on facts and circumstances developed in discovery.

Here, even assuming that Francis's allegations themselves do not adequately support a plausible inference that the KPM Defendants could exercise control over Endres in the circumstances of this case, then the lease between KPM and both Endres and Francis "nudges" his claim of landlord control over the plausibility line. The lease provides, for example, that the "Tenant shall not allow or commit any objectionable or disorderly conduct . . . that disturbs or interferes with the rights, comforts or conveniences of other residents." Joint App'x 53. The lease thus points to that "arsenal of incentives and sanctions that" the KPM Defendants could have applied to affect Endres's conduct but failed to use. Wetzel, 901 F.3d at 865 (quotation marks omitted); see Brief for the City of New York as Amicus Curiae Supporting Plaintiff-Appellant at 17 (describing remedial actions available to landlords); Brief for the State of New York as Amicus Curiae Supporting Plaintiff-Appellant at 17 (same).

New York's warranty of habitability, under which landlords warrant that "tenants are not subjected to any conditions endangering or detrimental to their life, health or safety," also persuades me that KPM could have responded to Endres's criminal harassment—because it was affirmatively <u>obligated</u> to do so. <u>Park W. Mgmt. Corp. v. Mitchell</u>, 47 N.Y.2d 316, 325, 327 (1979). A landlord is liable for breaching the implied warranty whenever it "deprive[s] [tenants] of the quiet enjoyment of their apartment" by "fail[ing] to take any effective steps to abate" detrimental conditions created by other tenants "despite having ample notice." <u>Nostrand Gardens Co-Op v. Howard</u>, 634 N.Y.S.2d 505, 505–06 (2d Dep't 1995). The scope of the obligation stretches from ordinary tenant-on-tenant complaints about noise to tenant-on-tenant criminal acts. <u>See</u> Restatement (Second) of Property: Landlord and Tenant § 6.1 (1977).[11] Although the majority opinion attempts to distinguish <u>Nostrand Gardens</u> on the ground that it involves "contractual liabilities," Majority Op. at 22 n.34, that has no bearing on a landlord's authority to take remedial action in a particular case. Regardless of a lease's terms, New York law requires landlords to take "minimal precautions to

---

[11] <u>See also</u> 24 C.F.R. § 966.4(f)(11), (l)(2)(i) (a public housing agency may terminate a tenancy for "serious or repeated violation of material terms of the lease," including the obligation that tenants act "in a manner which will not disturb other residents' peaceful enjoyment of their accommodations").

27

protect tenants from foreseeable harm, including a third party's foreseeable criminal conduct." Burgos v. Aqueduct Realty Corp., 92 N.Y.2d 544, 548 (1998) (quotation marks omitted).

The majority opinion latches on to a single New York case, Blatt v. New York City Housing Authority, to assert that the power to evict is never enough to show control under New York law. But Blatt demonstrates that whether a landlord has a duty under New York law to address tenant-on-tenant wrongdoing depends on the facts and circumstances developed in each case. See 506 N.Y.S.2d at 879–80; see also Simmons v. City of New York, 562 N.Y.S.2d 119, 120 (1st Dep't 1990).

For the reasons already explained, landlords in New York may be obligated to respond to complaints of severe or pervasive tenant-on-tenant harassment, regardless of whether that harassment is motivated by discrimination. "Depending on the particular circumstances, a landlord's appropriate remedial actions may include warning the offending tenant, involving agencies with expertise investigating charges of discrimination in housing . . . , or—if less drastic action proves ineffective—beginning formal eviction proceedings." Brief for the City of New York as Amicus Curiae

28

Supporting Plaintiff-Appellant at 17. "The mere reminder that eviction . . . [i]s a possibility might . . . deter[] some of the bad behavior" directed at fellow tenants. Wetzel, 901 F.3d at 865.[12] In the alternative, landlords can investigate tenant complaints and issue fines. See Brief for the State of New York as Amicus Curiae Supporting Plaintiff-Appellant at 17. Although the FHA provides important additional remedies where a landlord neglects those obligations with discriminatory impact, the fact remains that landlords already bear responsibility to address severe or pervasive harassment. Explicitly recognizing FHA liability in this context places no additional administrative burden on landlords.

In response, the majority says that "broad liability regimes might place landlords in the role of 'cops' who threaten their tenants with 'unrestrained vigilantism.'" Majority Op. at 27 n.44 (quoting B.A. Glesner, Landlords as Cops: Tort, Nuisance & Forfeiture Standards Imposing Liability on Landlords for Crime on the Premises, 42 Case W. L. Rev. 679, 791 (1992)). But that again puts a

---

[12] The majority casts Wetzel, in which the Seventh Circuit held that a landlord could be liable for tenant-on-tenant harassment, as a case involving an "unusual degree of control" over a community of senior citizens. Majority Op. at 24–25. But Wetzel addressed the landlord-tenant relationship generally, while explicitly "say[ing] nothing" about the FHA's application to "a skilled nursing facility[] or an assisted living environment," each of which is "different enough that they should be saved for another day." Wetzel, 901 F.3d at 864.

policy concern ahead of a legal mandate. See Bostock v. Clayton Cnty.,

--- U.S. ---, 140 S. Ct. 1731, 1745 (2020). Even the academic article the majority

cites in support of its concern acknowledges that landlords already may be

"liable for criminal activities of tenants that victimized other tenants," and that

where "a tenant's dangerousness could be readily predicted," courts have

"establish[ed] a landlord's duty to police tenants." Glesner, Landlords as Cops,

42 Case W. L. Rev. at 790. Unfazed, the majority observes that the "potentially

dramatic and arguably undesirable implications" of a text-based interpretation of

the FHA could not "have gone unnoticed for over fifty years after the passage of

that much-discussed and much-litigated legislation." Majority Op. at 30. But

when we interpret statutes there is no "such thing as a 'canon of donut holes,' in

which Congress's failure to speak directly to a specific case" (or "implication")

"creates a tacit exception" to a "general statutory rule." Bostock, 140 S. Ct. at

1747.

If we ignore these extra-legal policy concerns, then the allegations in

Francis's complaint, read in light of the duties imposed on KPM by New York

law and Francis's lease, and by the FHA itself, clearly raise a plausible inference

that the KPM Defendants had the "authority to take remedial action" against

30

Endres.  Davis, 526 U.S. at 644.  Whether KPM was equipped with the actual

tools to do so is a question of fact to be resolved at a later stage in this litigation.

2.  The Adequacy of the Landlord's Response

As noted, the majority also concludes that Francis failed to allege that

KPM's response to Endres's harassment was inadequate, as our precedent on

deliberate indifference requires.  See Majority Op. at 26–27; Gant, 195 F.3d at 141

("[T]he defendant's response to known discrimination" must not be "clearly

unreasonable in light of the known circumstances." (quotation marks omitted)).

The majority first says that the complaint alleged only that the "landlord failed to

respond to reports of race-based harassment by a fellow tenant."  Majority Op.

at 5.  To the contrary, the complaint alleged much more:  a landlord ignored

repeated requests to take action against a tenant who engaged in criminal

harassment.  The majority then accepts that KPM instructed Downing "not to get

involved" in response to Francis's repeated letters asking KPM to address

Endres's criminal behavior.  Nevertheless, the majority summarily asserts,

because "[t]he KPM Defendants were aware that the police were involved" there

is "no factual basis to infer that the KPM Defendants clearly acted

31

unreasonably." Majority Op. at 26–27. This defense draws all relevant inferences in favor of the KPM Defendants, not Francis.

As New York City explains, landlords in fact enjoy significant "flexibility" to "respond to known [tenant-on-tenant] harassment in a manner that is not clearly unreasonable" in light of the known circumstances. Davis, 526 U.S. at 648–49; Brief for the City of New York as Amicus Curiae Supporting Plaintiff-Appellant at 13–19. Whether KPM's explicit instruction not to act was "clearly unreasonable," or whether KPM's awareness that Francis had reported Endres to the police absolved KPM of liability for its inaction, depends on the actual degree of control exercised by the landlord rather than a fixed rule. It is for a jury, not judges, to decide.

For all the reasons set forth above, I would vacate the District Court's dismissal of Francis's FHA claims.

II.    The Civil Rights Act of 1866

Moving beyond the FHA, Francis also stated claims under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, which indisputably also prohibits post-acquisition housing discrimination. I therefore respectfully disagree with the majority's decision to affirm the District Court's dismissal of those claims.

"Congress passed the Civil Rights Act of 1866 in the aftermath of the Civil War to vindicate the rights of former slaves." Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1015 (2020). The Act is a "sweeping" civil rights law "forbidding all racial discrimination affecting the basic civil rights enumerated in the Act." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 433, 435 (1968). Specifically, Congress provided that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," 42 U.S.C. § 1981, and that "[a]ll citizens . . . shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property," id. § 1982.

This Court has explicitly recognized that § 1981 plaintiffs may prove discriminatory intent through evidence of a defendant's deliberate indifference to discrimination by third parties within their control. Gant, 195 F.3d at 139–40 (holding that the "proof of racially discriminatory intent" required to state a claim under § 1981 includes a showing of "deliberate indifference on the part of the defendants themselves"); Comcast Corp., 140 S. Ct. at 1016 (explaining that §§ 1981 and 1982 are construed similarly because they were enacted together and "use[] nearly identical language"). Even the majority acknowledges that

33

"Sections 1981 and 1982 reach . . . purposeful discrimination."  Majority Op. at 31 (quotation marks omitted).  For the reasons described at length above, Francis has adequately alleged that KPM was deliberately indifferent to Endres's known racial harassment.  That is enough to support Francis's claim that KPM acted with racially discriminatory intent under §§ 1981 and 1982.

III.    The NYSHRL

For the same reasons, I would also vacate the District Court's dismissal of Francis's claims brought under the NYSHRL, N.Y. Exec. Law § 296, a powerful state antidiscrimination statute that is at least as protective of Francis's rights as the FHA.  The majority opinion concludes that dismissal of Francis's claims under the FHA necessarily requires dismissal of his NYSHRL claims because the claims are evaluated under the same framework.  But this misunderstands that the FHA serves only as a "floor . . . below which states and localities may not fall."  Phillips v. City of New York, 884 N.Y.S.2d 369, 381 (1st Dep't 2009), abrogated on other grounds, Jacobsen v. N.Y.C. Health & Hosps. Corp., 22 N.Y.3d 824, 838 (2014).  Recently, in fact, the NYSHRL was amended to expressly provide that it be "construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights law,

34

including those with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300 (emphasis added). And the State of New York, as amicus, has urged this Court not to assume that the FHA and NYSHRL should be similarly interpreted, "especially in light of [these] recent amendments to the [NYSHRL] that the New York Court of Appeals has not had an opportunity to interpret." Brief for the State of New York as Amicus Curiae Supporting Plaintiff-Appellant at 24.

Unfortunately, the majority refused to heed the State's warning, declined to certify this important question of New York law, and proceeded with its own misinterpretation of state law. Of course, this does not spell the end of claims like Francis's under state law, since nothing prevents the New York State courts from correcting this awful error in the future.[13]

---

[13] The majority opinion also affirms the District Court's dismissal of Francis's state law claim for negligent infliction of emotional distress under New York law on the ground that a landlord owes no common law duty to prevent one tenant from harassing another tenant. See Majority Op. at 34–36. As explained above, that interpretation of New York law is mistaken. I concur in the dismissal of this claim for a quite different reason unrelated to KPM's duty. Any injury for negligent infliction of emotional distress "is compensable only when [it is] a direct, rather than a consequential, result of the breach" of a duty that a defendant owes to a plaintiff. Kennedy v. McKesson Co., 58 N.Y.2d 500, 506 (1983). Here, as alleged in the complaint and when viewed in the light most favorable to Francis, the KPM Defendants' intentional breach of the duty they may have owed Francis did not directly result in Francis's emotional distress, which Endres directly caused with his continued campaign of racial harassment.

IV.    Final Considerations

Offering a final justification for its flawed reading of Francis's complaint under the FHA and the remaining statutes at issue in this case, the majority suggests that its ruling will help "the most vulnerable among us."  Majority Op. at 28.  In reality, it will do no such thing, and not a single feature of the majority's interpretation reflects such a concern.  The experts—amici here—who so aptly describe what serves their clients' interests tell a far different story.  If anything, they suggest, the consequences of the majority opinion's holding will harm those most in need.  Tenant-on-tenant <u>sexual</u> harassment in housing, for example, is a widespread problem that "[p]rompt and appropriate responses by housing providers to tenant complaints of harassment are critical to preventing—or stopping."  Brief for ACLU et al. as Amici Curiae Supporting Plaintiff-Appellant at 6–12, 23.  "Absent liability under the FHA," another amicus explains, "landlords receiving complaints of harassment may ignore the discrimination . . . or even worse, they may further the discrimination by retaliating against the complainant," thereby causing "harmful escalations."  Brief for LatinoJustice PRLDEF et al. as Amici Curiae Supporting Plaintiff-Appellant at 27–28. Organizations representing paralyzed veterans and the elderly agree.  <u>See</u> Brief

for Paralyzed Veterans of Am. & Pub. Just. Ctr. as Amici Curiae Supporting Plaintiff-Appellant at 10–25; Brief for AARP et al. as Amici Curiae Supporting Plaintiff-Appellant at 12–29.

CONCLUSION

For the very limited reason provided above, I agree that we should affirm the dismissal of Francis's tort claim. But my agreement ends there. Because the pleading burden on Francis in this case was minimal, because he needed only to "raise a reasonable expectation that discovery will reveal evidence of the wrongdoing alleged, even if it strikes a savvy judge that actual proof of those facts is improbable," Citizens United, 882 F.3d at 380 (quotation marks omitted), and because he has plausibly alleged intentional discrimination by the defendants in this case under both federal and state law, I respectfully dissent as to all of Francis's remaining claims.